IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

|  |  |
|---|---|
| M.S.L., | Civ. No. 6:25-cv-01204-AA |
| Petitioner, | **OPINION AND ORDER** |
| v. | |
| DREW BOSTOCK, Seattle Field Office Director, Immigration and Customs Enforcement and Removal Operations ("ICE/ERO"); TODD LYONS, Acting Director of Immigration and Customs Enforcement ("ICE"); U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; KRISTI NOEM, Secretary of the Department of Homeland Security ("DHS"); U.S. DEPARTMENT OF HOMELAND SECURITY; PAMELA BONDI, Attorney General of the United States, | |
| Respondents. | |

_____

AIKEN, District Judge.

This case comes before the Court on Respondents' Motion to Dismiss, asserting lack of jurisdiction, ECF No. 13, on Petitioner's First Amended Petition for Writ of Habeas Corpus, ECF No. 16, and on Petitioner's Motion for Temporary Restraining Order, ECF No. 23. The Court held an evidentiary hearing on August 8, 2025. ECF No. 29. Petitioner appeared in person and testified with the assistance of a certified Spanish language interpreter. For the reasons set forth below, the Amended Petition

is GRANTED and Respondents are directed to immediately release Petitioner from custody subject to her previous Order of Supervision.

**BACKGROUND**

Petitioner M.S.L.[1] is a citizen of Mexico. Pet'r Decl. ¶ 1. ECF No. 17-2. Petitioner is transgender and asserts that, because of her gender expression, she has suffered violence and discrimination in Mexico. First Am. Pet. ("FAP") ¶¶ 1, 30. ECF No. 16.

On January 31, 2024, Petitioner entered the United States without inspection near Laredo, Texas. Weiss Decl. ¶ 4. ECF No. 14. Petitioner was taken into Department of Homeland Security ("DHS") custody on the same day. Weiss Decl. ¶ 4; Pet'r Decl. ¶ 4. Respondents assert that Petitioner "claimed no fear of returning to Mexico," while Petitioner maintains, in both her testimony and in her Declaration, that she "told an officer that [she] was in danger and needed to seek asylum." Weiss Decl. ¶ 4; Pet'r Decl. ¶ 4; Hearing Tr. 70:8-18. ECF No. 30. Respondents assert that Petitioner "requested and was granted a 'voluntary return' to Mexico." Weiss Decl. ¶ 4. Petitioner asserts that she was mistreated by the ICE officers at the border and told that she would be held in isolation for months unless she signed a voluntary deportation agreement and that, if she requested asylum, a judge would "just deport [her] anyway." Pet'r Decl. ¶ 4.

Petitioner was told that if she signed the document, which was in English, she "could try to reenter the United States the next day." Pet'r Decl. ¶ 4. Petitioner

---

[1] The Court has authorized Petitioner to proceed anonymously in this action. ECF No. 15.

signed the document and was returned to Mexico via Laredo, Texas Port of Entry Bridge II on February 2, 2024.  Weiss Decl. ¶ 4; Pet'r Decl. ¶ 5.

Petitioner found herself in dangerous conditions in Mexico and reentered the United States on February 3, 2024, by crossing the Rio Grande and was again taken into DHS custody.  Pet'r Decl. ¶¶ 5-6; Weiss Decl. ¶ 5.  Petitioner testified that she again told DHS officials that she feared for her life, although Respondents assert that Petitioner "claimed no fear if returned to Mexico."  Hearing Tr. 71:12-21; Weiss Decl. ¶ 5. Petitioner was processed by a female DHS officer and believed that the DHS officer was helping her complete an asylum application.  Pet'r Decl. ¶ 6.

On February 3, 2024, DHS determined that Petitioner was inadmissible under section 212(a)(7)(A)(i)(I) of the INA, 8 U.S.C. § 1182(a)(7)(A)(i)(I); and 8 U.S.C. § 1225(b)(1) because Petitioner lacked a valid visa or other entry documents.  Weiss Decl. ¶ 5.  Petitioner was issued a Determination of Inadmissibility and an Order of Removal under section 235(b)(1) of the INA.  Weiss Decl. ¶ 5; Ex. 1.  Petitioner was removed to Mexico via the Laredo, Texas Port of Entry Bridge II.  Weiss Decl. ¶ 5; Pet'r Decl. ¶ 6.

On February 8, 2024, Petitioner crossed the Rio Grande and entered to the United States a third time near Laredo, Texas and was arrested for trespassing on private property by local law enforcement.  Weiss Decl. ¶ 6; Pet'r Decl. ¶ 7.  Petitioner was able to secure the assistance of counsel after she was arrested and her attorney helped her explain her fear of returning to Mexico.  Pet'r Decl. ¶ 7.

Petitioner was transferred to ICE custody on February 25, 2024. Weiss Decl. ¶ 7. A Notice of Intent/Decision to Reinstate Prior Order was signed and issued on the same day and Petitioner signed an acknowledgment of the determination. Weiss Decl. Ex. 2.

Petitioner claimed fear of returning to Mexico and, on February 25, 2024, Petitioner was released on an Order of Supervision ("OSUP"). Weiss Decl. ¶ 8; Ex. 3. The OSUP stated that Petitioner had been ordered removed on February 3, 2024, and imposed a list of conditions for Petitioner's release, including requirements that she (1) appear in person at the time and place specified, upon each and every request of the agency, for identification and for deportation or removal; (2) that Petitioner not travel outside of California for more than 48 hours without notifying ICE and obtaining approval for travel; and (3) that she furnish ICE with notice of any change of residence or employment 48 hours prior to such change. Weiss Decl. Ex. 3, at 1. Petitioner acknowledged that any violation of the conditions of the OSUP "may result in you being taken into Service custody and you being criminally prosecuted." *Id.* Petitioner was informed that she was to report to the ICE office in Stockton, California. *Id.* at 5.

Petitioner was given permission to live with her aunt in Stockton, California. Pet'r Decl. ¶ 8. Petitioner checked in with ICE as required on March 27, 2024, and June 27, 2024. *Id.* Petitioner was told that her next check-in date was July 9, 2025. *Id.* Katrina Kilgren, Petitioner's immigration attorney, testified that check-in periods of a year or more are common when ICE is not concerned that the person

under supervision is a flight risk or otherwise requires close supervision. Hearing Tr. 32:17-31:3.

Petitioner began preparing her application for asylum and, as part of that process, her family connected her with "a woman named Teresa from Salem, Oregon who claimed to be an attorney." Pet'r Decl. ¶ 9. "Teresa" was later identified by Petitioner's counsel as Teresa Ruelas. Salzar Decl. ¶ 4. ECF No. 24-2. Ms. Ruelas helped Petitioner prepare an I-589 asylum application form. Pet'r Decl. ¶ 9.

Ms. Ruelas told Petitioner that it would be easier for her to help Petitioner if Petitioner moved to Oregon. Pet'r Decl. ¶ 9. Ms. Ruelas told Petitioner that she had made the arrangements for Petitioner to move to Oregon and registered a change of address and provided Petitioner with a confirmation code, which Petitioner believed was provided by immigration authorities confirming her new address in Oregon. *Id.* Petitioner's counsel was able to locate Ms. Ruelas, who confirmed to them that she had submitted a change of address form on behalf of Petitioner but was unable to provide them with a copy of the document because she was out of state. Salazar Decl. ¶¶ 10-11, 15. At the hearing, Petitioner produced a form, dated November 4, 2024, with an online change of address confirmation number written on it. Pet'r Ex. G; Hearing Tr. 41:6-8.

After multiple unsuccessful attempts to file her I-589 form, Petitioner learned that Ms. Ruelas was not a lawyer. Pet'r Decl. ¶ 9.

Petitioner sought assistance from Immigration Connection Salem in Salem, Oregon. Pet'r Decl. ¶ 10. With assistance from Immigration Connection Salem,

Petitioner submitted her I-589 form, Application for Asylum, Withholding of Removal, and protection under the Convention Against Torture in February 2025 and that application remains pending. FAP ¶ 33; Pet'r Decl. ¶ 10. Petitioner's I-589 form was filed online and included her Oregon address. Hearing Tr. 51:15-21.

While in Oregon, Petitioner received mail from the United States Citizenship and Immigration Service ("USCIS") at an Oregon address. Hearing Tr. 52:3-5. USCIS directed Petitioner to travel to their Portland, Oregon office for fingerprinting. *Id.* at 51:22-52:2. Petitioner attended her biometrics appointment at the USCIS office in Portland, Oregon in March 2025. *Id.* at 52:1-9.

USCIS and ICE are both agencies of the United States Department of Homeland Security. Hearing Tr. 52:12-13. Ms. Kilgren testified that she has learned from Freedom of Information Act requests that USCIS, ICE, and other DHS agencies share information and that ICE and USCIS share a biometrics office. *Id.* at 53:5-11. Ms. Kilgren testified that aliens under DHS supervision are given a single identification number, an "A number," which is used by all DHS agencies, including ICE and USCIS. *Id.* 52:14-17. Petitioner believed, based on the change of address confirmation number, the letters from USCIS sent to the Oregon address, and the direction to report to Portland for fingerprinting, that she had appropriately notified ICE of her move to Oregon; that the agency had consented to the move; and that the agency was aware of her presence in Oregon.

Respondents maintain that DHS records show that "ICE did not provide advance approval for Petitioner to relocate from California to Oregon." Sica Decl. ¶ 10. ECF No. 22.

When Petitioner's ICE check-in deadline was approaching, she asked Immigration Connection Salem what she should do and was told she should go to check in with the ICE office in Eugene, Oregon and make a record of her change of address. Pet'r Decl. ¶ 11; Hearing Tr. 76:14-15.

Petitioner went to the ICE office in Eugene, Oregon on July 9, 2025, for her scheduled check-in with ICE. Pet'r Decl. ¶ 11. When she arrived, ICE officers asked why Petitioner was there and she explained that she was there for her scheduled check-in. *Id.* Petitioner testified that she showed the ICE officers the confirmation number for her change of address. Hearing Tr. 74:21-75:4. The ICE officers examined her papers before telling Petitioner that their computers were not working so they could not process her address change and that she should return the following day. Pet'r Decl. ¶ 11; Hearing Tr. 77:10-11. Petitioner testified that she could see other ICE officers assisting people and using computers that appeared to be functional. Hearing Tr. 77:12-16. An ICE officer signed her check-in sheet for July 9, 2025, with the direction that Petitioner was to return the following morning, July 10, 2025, at 9:00 a.m. Pet'r Decl. ¶ 12. Petitioner submitted the signed check-in sheet at the hearing. Pet'r Ex. F.

Petitioner returned as directed on July 10, 2025. Pet'r Decl. ¶ 13. An ICE officer told Petitioner that she had a deportation order, which Petitioner

acknowledged, and the ICE officer told Petitioner that she would be detained and have her asylum interview in detention. *Id.* Petitioner testified that the ICE officers did not ask about her move to Oregon, nor did they say anything to her about missed check-in appointments. Hearing Tr. 78:6-9. Petitioner was taken into custody and transported to an immigration detention facility in Tacoma, Washington. Weiss Decl. ¶¶ 9-10; Pet'r Decl. ¶¶ 14-16. The original Petition for Writ of Habeas Corpus in this action was filed after Petitioner was taken into custody but before she was transported into Washington. ECF Nos. 1, 10.

Two days after she was taken into custody, on July 12, 2025, Petitioner was presented with a Notice of Revocation of Release (the "July 12 Notice"). Weiss Decl. Ex. 4, at 1. The July 12 Notice states that ICE had reviewed Petitioner's case and determined that she would be kept in custody. Weiss Decl. Ex. 4. The Notice continues:

> This decision has been made based on a review of your case; your existing order of removal; and a determination that there is a significant likelihood of your removal in the reasonably foreseeable future.
>
> Based on the above and pursuant to 8 C.F.R. 241.13, you are to remain in ICE custody at this time. You will promptly be afforded an informal interview at which time you will be given the opportunity to respond to the reasons for the revocation and to provide any evidence to demonstrate that your removal is unlikely.

Weiss Decl. Ex. 4.

The July 12 Notice is signed by Erik K. Johnson who is the Deputy Field Office Director ("DFOD") of the Seattle ICE Office of Enforcement and Removal Operations ("ERO"). Weiss Decl. Ex. 4; Johnson Decl. ¶ 1. ECF No. 27.

The July 12 Notice is in English, a language which Petitioner does not speak, and no translation was provided for her. Hearing Tr. 82:20-83:2. Petitioner testified that she only learned what the July 12 Notice said when another detainee explained the contents to her. *Id.* at 83:4-8. Despite the promise of a "prompt" informal interview, Petitioner testified that no ICE officer spoke with her in connection with the July 12 Notice or told her the reasons for her detention. *Id.* at 79:21-24. Petitioner was not given an opportunity to respond to the contents of the July 12 Notice. *Id.* at 84:7-9. Respondents called no witnesses at the hearing and presented no evidence that Petitioner was provided with an informal interview in connection with the July 12 Notice.

Ms. Kilgren testified that Petitioner participated in a "Reasonable Fear" interview in connection with her asylum application while in custody on July 29, 2025. Hearing Tr. 56:1-2. The interviewing officer prepared a Reasonable Fear Determination Checklist and Written Analysis. Pet'r Ex. C. ECF No. 24-1. The interviewing officer determined that Petitioner had offered credible testimony that she suffered a threat of death if she returned to Mexico based on her membership in a particular social group, "Sexual Minorities in Mexico." *Id.* at 1-2. The officer determined that Petitioner's testimony "establishes a reasonable possibility of persecution," and returned a positive reasonable fear determination. *Id.* at 2.

Once a reasonable fear determination has been made, the asylum officer will "issue a Form I-863, Notice of Referral to an Immigration Judge, for full consideration of the request for withholding of removal only." 8 C.F.R. § 208.31(e). A "stay of

removal remains in effect" for Petitioner's removal order "through completion of the withholding only proceedings and any subsequent appeal to the Board of Immigration Appeals." Sica Decl. ¶ 12.

On August 6, 2025, ICE issued a second Notice of Revocation of Order of Supervised Release (the "August 6 Notice."). Johnson Decl. Ex. A. The August 6 Notice was issued nearly one month after Petitioner was taken into ICE custody. Respondents assert that the August 6 Notice was issued "because the prior OSUP revocation form inadvertently referenced 8 C.F.R. 241.13 rather than 8 C.F.R. 241.4(l) and did not fully explain the reasons for revocation." Sica Decl. ¶ 4.[2] Nevertheless, Respondents maintain that the "reasons for revocation remain unchanged." *Id.*

Like the July 12 Notice, the August 6 Notice states that Petitioner's OSUP has been revoked and that she has been taken into the custody of ICE. It goes on to provide a new rationale for Petitioner's detention:

> This decision has been made based on a review of your official alien file and a determination that there are changed circumstances in your case.
>
> You are advised that ICE has determined that you have violated conditions of your release that were listed in the Order of Supervision you were issued at the time of your release from ICE custody, to wit, you failed to report in at a time and place as required and failed to timely notify and obtain advance permission of ICE prior to your relocation to Oregon from California.
>
> Based on the above, and pursuant to 8 C.F.R. § 241.4, you are to remain in ICE custody at this time. You will promptly be afforded an informal interview at which you will be given an opportunity to respond to the

---

[2] The Court notes that ICE waited nearly a month to make this "correction" and did so less than 48 hours before the evidentiary hearing on the habeas petition.

> reasons for the revocation.  You may submit any evidence or information
> you wish to be reviewed in support of your release.

Johnson Decl. Ex. A, at 1.

Like the July 12 Notice, the August 8 Notice was signed by DFOD Erik K. Johnson.  Johnson Decl. Ex. A, at 1.

In the evening of August 6, 2025, Petitioner participated in an informal interview in connection with the August 6 Notice.   Johnson Decl. Ex. A, at 3. Petitioner testified that this was the first time an ICE official had explained why she was detained.  Hearing Tr. 80:4-16.  In the Sica Declaration, Respondents refer to this as a "second informal interview," Sica Decl. ¶ 5, but the evidence before the Court is that no interview was ever conducted in connection with the July 12 Notice.  During the interview, Petitioner gave an oral statement concerning the stated reason for the revocation of the OSUP, which the interviewing officer recorded as follows:

> My lawyer Teresa Ruellas [sic] told me it would be better for my case if
> I moved to Oregon.  She told me she arranged the transfer and gave me
> a paper receipt of the notification to ICE.  Later I found out she was not
> really a lawyer and had not been working on my case.

Johnson Decl. Ex. A, at 3.

Petitioner testified that the interviewing officer told Petitioner "that they should remove [Petitioner] already" to a third country, although the officer did not identify where Petitioner would be sent.  Hearing Tr. 82:3-9.

## LEGAL STANDARDS

### I.    Admission Process and Parole Under the INA

The Ninth Circuit has observed that "[d]ivining [the] meaning [of the Immigration and Nationality Act] is not ordinarily for the faint of heart," comparing the "complex provisions of the INA" to "a morass," a "Gordian knot," and "King Mino's labyrinth in ancient Crete." *Torres v. Barr*, 976 F.3d 918, 923 (9th Cir. 2020) (internal quotation marks and citations omitted).

The Immigration and Nationality Act ("INA") establishes the framework governing noncitizens' entry into and removal from the United States, with regulations promulgated by the enforcing agencies providing further governance. When a noncitizen arrives seeking entry into the United States, they are deemed an "applicant for admission." 8 U.S.C. § 1225(a)(1). The INA has many categories of "inadmissibility." *See generally* 8 U.S.C. § 1182. Noncitizens who arrive at a port of entry without a visa or other document are deemed "inadmissible" under 8 U.S.C. § 1182(a)(7).

When a noncitizen is deemed inadmissible under § 1182(a)(7), the immigration officer must order the noncitizen's removal, unless the noncitizen indicates either an intention to apply for asylum or a fear of persecution. 8 U.S.C. § 1225(b)(1)(A)(ii).

If a noncitizen is found to have reentered the United States illegally after having been removed or having departed voluntarily under an order of removal, the prior order of removal is reinstated from its original date and is not subject to being

reopened or reviewed.  8 U.S.C. § 1231(a)(5).  The noncitizen is subject to removal under the prior order "at any time after reentry."  *Id.*

## II.    Habeas Corpus Under 28 U.S.C. § 2241

Under 28 U.S.C. § 2241, federal district courts "within their respective jurisdictions" have the authority to hear applications for habeas corpus by any person who claims to be held "in custody in violation of the Constitution or laws or treaties of the United States."  The "essence of habeas corpus is an attack by a person in custody upon the legality of that custody," and thus to be within the "core of habeas corpus," a petitioner must seek "either immediate release from that confinement or the shortening of its duration."  *Prieser v, Rodriguez*, 411 U.S. 475, 484, 489 (1973).

## DISCUSSION

Respondents assert that Petitioner was taken into custody "due to several violations of the OSUP release agreement," including that (1) Petitioner failed to report to ICE officials on several occasions as required; (2) Petitioner failed to inform ICE officials in California that she was moving to Oregon; and (3) that Petitioner departed California without permission or timely notifying ICE of her new address. Weiss Decl. ¶ 9.

Petitioner asserts that she has been held in detention in violation of her constitutional due process rights and that ICE's actions are arbitrary and capricious under the Administrative Procedure Act.

## I.    Jurisdiction

In their Motion to Dismiss, ECF No. 13, Respondents argue that the Court lacks jurisdiction to consider the Petition.  Respondents base their argument on 8 U.S.C. § 1252(g), which provides:

> Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to hear any cause of claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

8 U.S.C. § 1252(g).

Respondents also cite 8 U.S.C. § 1252(b)(9), which provides that judicial review "arising from any action taken or proceeding brought to remove an alien from the United States" is only available for judicial review of a final order and, except as otherwise provided by § 1252, "no court shall have jurisdiction," including by habeas petition under 28 U.S.C. § 2241, "to review such an order or such questions of law or fact."  The "sole and exclusive means for judicial review of an order of removal" is "a petition for review filed with an appropriate court of appeals."  8 U.S.C. § 1252(a)(5).

"By virtue of their explicit language, both §§ 1252(a)(5) and 1252(b)(9) apply only to those claims seeking judicial review of orders of removal."  *Singh v. Gonzales*, 499 F.3d 969, 978 (9th Cir. 2007).  In *Zadvydas v. Davis*, 533 U.S. 678, 687-688 (2001), the Supreme Court held that habeas petitions remain an available remedy for noncitizens held in detention when the basis for the petition is not one of those bases placed outside the jurisdiction of the court by statute.

The Supreme Court has interpreted § 1252(g)'s jurisdiction-stripping provision narrowly, limiting it to only "three discrete actions": the "'decision or action' to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders.'" *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482 (1999) ("*AADC*") (quoting 8 U.S.C. § 1252(g)) (emphasis in original). The Court rejected any reading of the statute that would cover "the universe of deportation claims," *id.*, and cautioned against interpreting § 1252(g) with "uncritical literalism" to sweep in any claim that can technically be said to "arise from" these three actions. *Jennings v. Rodriguez*, 583 U.S. 281, 293-95 (2018).

Section 1252(g) is directed against "a particular evil: attempts to impose judicial constraints upon prosecutorial discretion." *AADC*, 525 U.S. at 485 n.9. But the provision "shields discretionary determinations to deny relief, not failures to honor relief already granted." *Spulveda Ayala v. Bondi¸* CASE NO 2:25-cv-01063-JNW-TLF, 2025 WL 2084400, at *3 (W.D. Wash. July 24, 2025).

Courts have "distinguished between challenges to ICE discretion to execute a removal order, which are barred, and challenges to the manner in which ICE executes the removal order, which are not." *Ceesay v. Kurzdorfer*, ___F. Supp.3d.___, 25 CV-267-LJV, 2025 WL 1284720, at *8 (W.D.N.Y. May 2, 2025). In *Ceesay*, the district court confronted a jurisdictional challenge under §§ 1252(b)(9) and (g) and determined that because the petitioner "d[id] not challenge ICE's ability to remove him but only the legality of his current detention" and "ICE"s ability to hold him in detention without adequate process for weeks and months on end," that § 1252 did

not prevent the exercise of jurisdiction by a district court over the habeas petition. *Id.* at *9-10.

Here, as in *Ceesay*, the parties do not dispute that Petitioner has an order of removal—Petitioner herself acknowledged as much when speaking with ICE officers prior to her detention. Petitioner is not challenging her order of removal. Rather, she challenges the present fact of her detention and the lack of process surrounding her detention and she alleges that the revocation of her OSUP was done without regard for her due process rights and in an arbitrary and capricious manner.

Petitioner's case does not challenge the commencement of proceedings, the adjudication of a case, or the execution of an order of removal and so this Court is not deprived of jurisdiction by § 1252(g). Nor does Petitioner challenge her final order of removal, such that the Court would be deprived of jurisdiction under § 1252(b)(9).

## II.    Credibility

At the evidentiary hearing held on August 8, 2025, the Court heard testimony from Petitioner, as well as Petitioner's immigration attorney Katrina Kilgren. Respondents did not call any witnesses and opted to rely instead on the Weiss, Sica, and Johnson Declarations and their supporting exhibits.

The Court considered Petitioner's demeanor and manner of testifying and the general consistency of Petitioner's testimony with the documentary evidence and finds Petitioner's testimony credible.

The Court similarly considered Ms. Kilgren's demeanor and manner of testifying and finds Ms. Kilgren's testimony credible.

The Court wishes to note that there are several statements in the Declarations submitted by Respondents which might, with charity, be described as serious inaccuracies. For example, ICE Supervisory Detention and Deportation Officer Jason Weiss affirms that "Petitioner failed on *several occasions* to report to ICE officials at the time and place specified, as required under the terms of the Order of Supervision." Weiss Decl. ¶ 9 (emphasis added). Petitioner's ICE sign-in sheet directly contradicts this statement and shows that ICE officers signed off on each of Petitioner's check-in dates. At the hearing, the evidence was that, at worst, Petitioner reported to the wrong ICE office on July 9, 2025. There is no evidence that Petition failed to report on "several occasions" as Weiss affirms.

Similarly, ICE Supervisory Detention and Deportation Office Christopher Sica affirms that a "second" informal interview of Petitioner was conducted when the August 6 Notice was served. Sica Decl. ¶ 5. While there is evidence that an informal interview took place on August 6, 2025, Johnson Decl. Ex. A, at 3, there is no evidence that any informal interview took place in connection with the July 12 Notice. Respondents have not produced a signed record of that interview, as they did for the August 6 interview, and Petitioner credibly testified that she was never provided with an informal interview or an explanation of the reason for her detention until August 6, 2025.

## III.  The Habeas Petition

The First Amended Petition for Writ of Habeas Corpus asserts that Petitioner's detention is unlawful because it is being carried out in violation of Petitioner's due

process rights under the Fifth Amendment and because the revocation of the OSUP was arbitrary and capricious in violation of the Administrative Procedure Act ("APA").

## A. Due Process

The Due Process clause prohibits deprivations of life, liberty, and property without due process of law. U.S. Const. amend. V. It is firmly established that these protections extend to noncitizens present in the United States. *See Trump v. J.G.G.*, 604 U.S. ___, 145 S. Ct. 1003, 1006 (2025) (per curiam) ("It is well established that the Fifth Amendment entitles aliens to due process of law in the context of removal proceedings." (internal quotation marks and citation omitted)); *Zadvydas*, 533 U.S. at 693 ("[T]he Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent."). "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty [the Due Process] Clause protects." *Zadvydas*, 533 U.S. at 690. "Even those who face significant constraints on their liberty or those over whose liberty the government wields significant discretion retain a protected interest in their liberty." *Rosado v. Figueroa*, No. CV 25-02157 PHX DLR (CDB), 2025 WL 2337099, at *11 (D. Ariz. Aug. 11, 2025). The essence of procedural due process is that a person risking a serious loss be given notice and an opportunity to be heard in a meaningful manner and at a meaningful time. *Mathews v. Eldridge*, 424 U.S. 319, 348 (1976).

"Although ICE has the initial discretion to detain or release a noncitizen pending removal proceedings, after that individual is released from custody, they have a protected liberty interest in remaining out of custody." *Rosado*, 2025 WL 2337099, at *12; *see also Ortega v. Bonnar*, 415 F. Supp.3d 963, 969 (N.D. Cal. 2019) ("Just as people on preparole, parole, and probation status have a liberty interest, so too does [a noncitizen released from immigration detention] have a liberty interest in remaining out of custody on bond.").

The authority of ICE to detain noncitizens under federal law derives from 8 U.S.C. § 1231, which directs the Attorney General of the United States to affect the removal of any noncitizen from this country within 90 days of any order of removal. 8 U.S.C. § 1231(a)(1). However, once that time passes and after "removal is no longer reasonably foreseeable, continued detention is no longer authorized by statute," the noncitizen must be released. *Zadvydas*, 533 U.S. at 699. Upon release, a noncitizen subject to a final order of removal must comply with certain conditions of release. 8 U.S.C. § 1231(a)(3), (6).

Noncitizens subject to a removal order may be released pursuant to 8 C.F.R. § 241.4 or 8 C.F.R. § 241.13. *Ceesay*, 2025 WL 1284720, at *15 n. 22. Both provisions have been cited in this case. The August 6 Notice states that Petitioner's detention is pursuant to 8 C.F.R. § 241.4, while the earlier July 12 Notice states that it is pursuant to 8 C.F.R. § 241.13. Respondents assert that the reference to § 241.13 in the July 12 Notice was an error and that the correct regulation is § 241.4 as cited in the August 6 Notice. Sica Decl. ¶ 4.

The Court will therefore begin with an analysis of § 241.4. Subsection 241.4(l)(2), which is entitled "Determination by the Service" provides:

> The Executive Associate Commissioner shall have authority, in the exercise of discretion, to revoke release and return to Service custody an alien previously approved for release under the procedures in this section. A district director may also revoke release of an alien when, in the district director's opinion, revocation is in the public interest and circumstances do not reasonably permit referral of the case to the Executive Associate Commissioner. Release may be revoked in the exercise of discretion when, in the opinion of the revoking official:

(i)     The purposes of release have been served;

(ii)    The alien violates any condition of release;

(iii)   It is appropriate to enforce a removal order or to commence removal proceedings against an alien; or

(iv)    The conduct of the alien, or any other circumstance, indicates that release would no longer be appropriate.

8 C.F.R. § 241.4(l)(2).

**1. Johnson lacked authority to revoke Petitioner's release.**

Petitioner asserts, at the outset, that Respondents have not complied with the requirements of § 241.4(l) because the wrong official has revoked Petitioner's release. Both the July 12 Notice and the August 6 Notice were signed by Erik Johnson, the Deputy Field Office Director for ICE's Office of Removal and Enforcement in Tacoma, Washington.

As the district court explained in *Ceesay*, the post-September 11 re-organization of immigration enforcement resulted in the transfer of authority for removal proceedings to DHS, which includes ICE, and "statutory references to the authority that was formerly responsible for those functions will be deemed to refer to

DHS." *Ceesay*, 2025 WL 1284720, at *15 (internal quotation marks and citation omitted).

ICE regulations provide that, in this context, the "Executive Associate Commissioner of INS" is equivalent to the "Executive Associate Director of ICE." 8 C.F.R. § 1.2; *Ceesay*, 2025 WL 1284720, at *16. Section 1.2 continues:

> Director or district director prior to March 1, 2003, means the district director or regional service center director, unless otherwise specified. On or after March 1, 2003, pursuant to delegation from the Secretary of Homeland Security or any successive re-delegation, the terms mean, to the extent that authority has been delegated to such official: asylum office director; director, field operations; district director for interior enforcement; district director for services; field office director; service center director; or special agent in charge. The terms also means such other official, including an official in an acting capacity, within the U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, U.S. Immigration and Customs Enforcement, or other component of the Department of Homeland Security who is delegated the function or authority above for a particular geographic district, region, or area.

8 C.F.R. § 1.2.

Here, the parties agree that Johnson is a Deputy Field Office Director and not the Executive Associate Director of ICE, a field office director, or any of the other positions enumerated in § 1.2. *See* Johnson Decl. ¶ 1 (describing Johnson's position within ICE). Nevertheless, Respondents maintain that Johnson had the authority to revoke Petitioner's release. *See* Johnson Decl. ¶ 4 ("On August 6, 2025, I signed an amended Notice of Revocation of the Order of Supervision ('OSUP'). I have the authority under the relevant regulations and delegation of authority to do so."). Respondents have not, however, provided the Court with a copy of a delegation order

or any other evidence documenting the scope of any delegation of authority over the revocation of removal orders to Johnson or any other Deputy Field Office Director.

In *Ceesay*, the district court found that the absence of a delegation order giving an assistant field office director authority to revoke release, as well as the absence of caselaw to support the validity of such an order even if it did exist, rendered the revocation of the petitioner's release unlawful. *Ceesay*, 2025 WL 1284720, at *17. The Court finds this reasoning persuasive.

In the absence of any evidence that Johnson had the authority to revoke Petitioner's release, other than Johnson's breezy assertion that he possesses the authority, the Court concludes that Petitioner's release was not lawfully revoked and that she is entitled to release on that basis alone. However, there are additional procedural defects in Petitioner's detention that warrant examination.

## 2. Respondents failed to timely provide Petitioner with a valid Notice of Revocation and failed to promptly conduct an informal interview.

As noted, Petitioner asserts that ICE failed to provide her with an informal interview as required by the relevant regulations. Under 8 C.F.R. § 241.4(l)(1), which is entitled "Violation of conditions of release":

> Any alien described in paragraph (a) or (b)(1) of this section who has been released under an order of supervision or other conditions of release who violates the conditions of release may be returned to custody . . . *Upon revocation, the alien will be notified of the reasons for revocation of his or her release or parole. The alien will be afforded an initial interview promptly after his or her return to Service custody to afford the alien an opportunity to respond to the reasons for notification stated in the notification.*

8 C.F.R. § 241.4(l)(1) (emphasis added).

Here, Petitioner was taken into ICE custody on July 10, 2025. Although § 241.4(l)(1) requires that she be notified of the reasons for the detention "upon revocation [of release]," Petitioner was not provided with a Notice of Revocation until July 12, 2025, two days after she was taken into custody. Petitioner credibly testified that the July 12 Notice was only provided to her in the English language, which she does not speak, and that no translation was provided to her. Petitioner credibly testified that she did not learn the meaning of the July 12 Notice until a fellow detainee who spoke both English and Spanish explained it to her.

Substantively, the July 12 Notice is also defective. It states, in vague terms, that the revocation decision was "made based on a review of your case; your existing order of removal; and a determination that there is a significant likelihood of your removal in the reasonably foreseeable future." Weiss Decl. Ex. 4. There is no reference to any violation of the OSUP, which Respondents would subsequently assert was the reason for the revocation of Petitioner's release. Additionally, the July 12 Notice states that Petitioner had been taken into custody "pursuant to 8 CFR 241.13," which Respondents now admit is not the actual basis of her detention.

More concerningly, the July 12 Notice states that Petitioner "will promptly be afforded an informal interview at which time you will be given the opportunity to respond to the reasons for the revocation and to provide any evidence to demonstrate

that your removal is unlikely." Weiss Decl. Ex. 4. As noted, the provision of an informal interview is required by § 241.4(l)(1).[3]

Petitioner credibly testified that she never received an interview in connection with the July 12 Notice. As previously discussed, Respondents hint that an informal interview took place, *see* Sica Decl. ¶ 5 (referring to the August 6 interview as a "second informal interview"), but they have not provided any evidence or testimony to support the suggestion that such an interview was done for the July 12 Notice. On this record, the Court concludes that Petitioner was not provided with an informal interview in connection with the July 12 Notice.

Respondents tacitly acknowledged the deficiency of the July 12 Notice when Johnson signed the August 6 Notice. Respondents affirm that the August 6 Notice was issued "because the prior OSUP revocation form inadvertently referenced 8 C.F.R. 241.13 rather than 8 C.F.R. 241.4(l) and did not fully explain the reasons for revocation," but the "reasons for revocation remain unchanged" and a "determination was made pursuant to 8 C.F.R. 241.4(l)(2)(ii) that Petitioner had violated the conditions of release." Sica Decl. ¶ 4.

The August 6 Notice states that Petitioner violated the conditions of her release by failing to report at the time and place required and that she failed to timely notify and obtain permission from ICE before relocating from California to Oregon. Johnson Decl. Ex. A, at 1. Petitioner was provided with an informal interview on

---

[3] A "prompt" informal interview is also a requirement of 8 C.F.R. § 241.13(i)(3), which is the provision cited in the July 12 Notice.

August 6, 2025, during which she explained that a woman she believed was her lawyer had obtained ICE's permission for her relocation.  Johnson Decl. Ex. 1, at 3.

The August 6 Notice cannot paper over the procedural defects in Petitioner's detention, however.  First, § 241.4(l)(1) requires that when a noncitizens' release is revoked, she is to be notified of the reason "upon revocation," and not after nearly a month in detention.  Likewise, the informal interview is to be provided "promptly after his or her return to Service custody."  8 C.F.R. § 241.4(l)(1).  Petitioner was taken into ICE custody on July 10, 2025, and did not receive her belated informal interview until *twenty-seven days later*, on August 6, 2025, less than 48 hours before the evidentiary hearing on the habeas petition.  This cannot reasonably be construed as a "prompt" informal interview and, to their credit, Respondents do not even attempt to argue that the interview was prompt.  *See Ceesay*, 2025 WL 1284720, at *21 (finding that the petitioner was not afforded even minimal due process protections when ICE failed to provide petitioner with an informal interview upon his re-detainment); *Wing Nuen Liu v. Carter*, Case No. 25-cv-03036-JWL, 2025 WL 1696526, at *2 (D. Kan. June 17, 2025) (finding "that officials did not properly revoke petitioner's release pursuant to § 241.13" because "most obviously . . . petitioner was not granted the required interview upon the revocation of his release."); *Hoac v. Becerra*, No. 2:25-cv-01740-DC-JDP, 2025 WL 1993771, at *4 (E.D. Cal. July 16, 2025) (finding that the petitioner was likely to succeed on a claim that his redetainment was unlawful because "there is no indication that an informal interview was provided to Petitioner.").

Government agencies are required to follow their own regulations. *United States ex rel Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954); *Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 852 (9th Cir. 2003). Courts have found that when ICE fails to follow its own regulations in revoking release, the detention is unlawful and the petitioner's release must be ordered. *See Ceesay*, 2025 WL 1284720, at *20-21; *Rombot v. Souza*, 296 F. Supp.3d 383, 387 (D. Mass. 2017). More fundamentally, ICE's failure to provide Petitioner with a timely Notice of Revocation or conduct an informal interview until nearly a month after taking her into custody is a grave violation of Petitioner's due process rights in that they deprived her both of meaningful notice and an opportunity to be heard.

In sum, ICE failed to follow its own regulations in detaining Petitioner by (1) failing to provide a timely Notice of Revocation of Petitioner's Order of Supervision; (2) failing to provide a Notice of Revocation signed by an official authorized to revoke Petitioner's release; and (3) failing to provide Petitioner with a "prompt" informal interview so that she could contest the reasons for her revocation. In doing so, ICE violated Petitioner's constitutional due process rights. Petitioner's habeas petition will be GRANTED and Petitioner will be ordered RELEASED.

## B. APA

Petitioner also asserts that her detention is arbitrary and capricious under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.* "The APA establishes a basic presumption of judicial review for one suffering a legal wrong because of agency action. That presumption can be rebutted by showing that the relevant statute

precludes review, § 701(a)(1), or that the agency action is committed to agency discretion by law, § 701(a)(2)." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16-17 (2020) (internal quotation marks and citations omitted, alterations normalized). "[O]nly upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review." *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 141 (1967). The Supreme Court has read the "committed to agency discretion" exception "quite narrowly, restricting it to those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019) (internal quotation marks and citation omitted); *see also Probodanu v. Sessions*, 387 F. Supp.3d 1031, 1045 (C.D. Cal. 2019) ("Although the APA precludes review of agency decisions that are 'committed to agency discretion by law,' 5 U.S.C. § 701(a)(2), this bar does not extend to agency decisions when . . . there are 'statutes regulations, established agency policies, or judicial decisions that provide a meaningful standard against which to assess' an agency's action." (quoting *Mendez-Gutierrez v. Ashcroft*, 340 F.3d 865, 868 (9th Cir. 2003)).

Here, Respondents maintain that, despite references to 8 C.F.R. § 241.13, Petitioner's release was revoked pursuant to 8 C.F.R. § 241.4(l). That regulation provides that release may be revoked in the exercise of discretion by the Executive Associate Director of ICE or by a district director when "in the district director's opinion, revocation is in the public interest and circumstances do not reasonably

permit referral of the case to the [Executive Associate Director of ICE]." 8 C.F.R. § 241.4(l)(2). "Release may be revoked in the exercise of discretion when, in the opinion of the revoking official: (i) The purposes of release have been served; (ii) The alien violates any condition of release; (iii) It is appropriate to enforce a removal order to commence removal proceedings against an alien; or (iv) The conduct of the alien, or any other circumstance, indicates that release would no longer be appropriate." *Id.*

Plainly, 8 C.F.R. § 241.4(l) involves the exercise of discretion, but that discretion is limited by the terms of the regulation itself. In cases where the local official makes the decision, rather than the Executive Associate Director of ICE, they must conclude that revocation is in the public interest and that the circumstances prevent referral of the case to the Executive Associate Director of ICE. And in all cases, the exercise of discretion is limited to the four enumerated circumstances in § 241.4(l)(2). The Court concludes that this is not one of those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion. As a result, the Court concludes that this is not a case where the agency discretion places the decision beyond the reach of judicial review. The Court therefore proceeds with consideration of the decision to detain Petitioner under the arbitrary or capricious standard.

Under the APA, courts must "hold unlawful and set aside agency action . . . found to be—arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law" or "without observance of procedure required by law." 5 U.S.C. § 706(2). Agency action is

arbitrary and capricious if the agency relied on factors which Congress
has not intended it to consider, entirely failed to consider an important
aspect of the problem, offered an explanation for its decision that ran
counter to the evidence before the agency, or is so implausible that it
could not be ascribed to a difference in view or the product of agency
expertise.

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29,

43 (1983).

"[T]he touchstone of arbitrary and capricious review under the APA is reasoned

decisionmaking." *Altera Corp & Subsidiaries v. Comm'r of Internal Review*, 926 F.3d

1061, 1080 (9th Cir. 2019) (internal quotation marks and citation omitted).  "[A]n

agency's action can only survive arbitrary or capricious review where it has

articulated a satisfactory explanation for its actions including a rational connection

between facts found and the choice made." *Alliance for the Wild Rockies v. Petrick*,

68 F.4th 475, 493 (9th Cir. 2023) (internal quotation marks and citation omitted,

alteration normalized).  A court "may not infer an agency's reasoning from mere

silence." *Arrington v. Daniels*, 516 F.3d 1106, 1112 (9th Cir. 2008) (internal quotation

marks and citation omitted).  "[I]t makes no difference what [an agency] may have

had in mind but failed to express; an administrative agency is not allowed to change

direction without some explanation of what it is doing and why." *Int'l Union, UAW

v. NLRB*, 802 F.2d 969, 973-74 (7th Cir. 1986).  "An agency may not, for example,

depart from a prior policy *sub silencio* or simply disregard rules that are still on the

books." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (citation

omitted).  Courts "must not 'rubber stamp' administrative decisions that [it] deem[s]

inconsistent with a statutory mandate or that frustrate the congressional policy

underlying a statute." *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 859 (9th Cir. 2005) (internal quotation marks and citation omitted, alterations normalized).

It is Respondents' burden to "provide a reasoned explanation for [their] action." *Fox Television*, 556 U.S. at 515. "Post-hoc rationalizations cannot justify an agency's actions." *Oregon Council for Humanities v. United States DOGE Serv.*, ___ F. Supp.3d___, Case No. 3:25-cv-829-SI, 2025 WL 2237478, at *30 (D. Or. Aug. 6, 2025) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419 (1971)).

### 1. Respondents' shifting justifications for detaining Petitioner appear to be post-hoc rationalizations for agency action.

Here, Respondents' stated rationale for the revocation of Petitioner's release has shifted over time. When she was initially taken into ICE custody on July 10, 2025, Petitioner was not provided with an explanation at all. She did not receive a Notice of Revocation until two days later, on July 12, 2025, when she was given a letter in English that said there had been "a determination that there is a significant likelihood of [her] removal in the reasonably foreseeable future." Weiss Decl. Ex. 4. Petitioner was also told that the revocation of her release was done pursuant to 8 C.F.R. § 241.13, which Respondents now assert was erroneous. *Id.*

Petitioner was presented with an entirely new justification and legal basis for her detention on August 6, 2025, by which time she had been in ICE custody for twenty-seven days. The August 6 Notice, signed by the same official who had signed the July 12 Notice, stated that Petitioner had violated the conditions of her OSUP by

relocating to Oregon from California without notifying or receiving permission from ICE and that she'd failed to check in at the time and place required, citing to 8 C.F.R. § 241.4. The August 6 Notice was given to Petitioner less than forty-eight hours before the evidentiary hearing on Petitioner's Amended Petition for Writ of Habeas Corpus.

The explanations offered to the Court have been similarly mercurial. In the Weiss Declaration, for example, Weiss affirmed that "Petitioner failed on several occasions to report to ICE officials at the time and place specified, as required by the terms of the Order of Supervision." Weiss Decl. ¶ 9. This assertion is flatly contradicted by Petitioner's ICE check-in sheet, which shows ICE officer signatures for every time Petitioner was required to report, including on July 9, 2025.

Similarly, in their Motion to Dismiss, filed on July 14, 2025, Respondents asserted that Petitioner "violated the conditions of her release by failing to report in person and by reporting several months late." Resp. Mot. 3. This assertion is not accompanied by any citation to evidence, nor does it find support in the record. As noted, Petitioner's check-in sheet shows that she appeared in person at every scheduled date.

Perhaps in acknowledgment of the inaccuracy of the Weiss Declaration and the statements made by counsel in the Motion to Dismiss, Respondents shifted their focus during the hearing to the fact that Petitioner reported to the ICE office in Eugene, Oregon rather than to the ICE office in Stockton, California on July 9, 2025.

The changes in the stated basis and justification for Petitioner's detention between the July 12 Notice and August 6 Notice, as well as the inaccurate statements in the Motion to Dismiss and the Weiss Declaration bear the hallmarks of post-hoc decisionmaking—ICE took Petitioner into custody on July 10, 2025, and, over the following weeks, ICE presented multiple inconsistent or factually unsupported explanations for doing so.

**2. The revocation of Petitioner's OSUP was arbitrary and capricious.**

Petitioner has presented evidence that, through a representative, she applied for permission to relocate to Oregon and that she was given a confirmation number. Ms. Kilgren credibly testified that ICE permits noncitizens like Petitioner to relocate based on applications made by their representatives, and that it is "appropriate for an attorney or legal representative to [notify ICE of a change in address] on behalf of somebody who has a supervision agreement." Hearing Tr. 30:8-24; 36:11-13. Ms. Kilgren testified that she "routinely" notifies ICE of changes of address for her clients when they are on supervision and Ms. Kilgren will "update them either by email or even by phone call." *Id.* at 36:13-15.

Ms. Kilgren testified that the most frequent venue for updating a noncitizen's address with ICE is at the time of the ICE check-in, but that the process can also be completed online. Hearing Tr. 30:15-19. Ms. Kilgren testified that address changes are ministerial in nature and that, in her fifteen years as an immigration attorney, she has never had a client detained because of their address. *Id.* at 28:15-17; 30:20-25. Ms. Kilgren also testified that, when an address change is processed "there isn't

formal documentation or a formal specific form or process that needs to happen, and also the person doesn't get a formal confirmation back." *Id.* at 31:9-15.

Ms. Kilgren credibly testified that when she has had clients who missed check-ins with ICE, they would be "switched to more frequent appointments, or they would have an ankle monitor installed on their body," but that she has never had a client detained because they checked-in with a different ICE office. Hearing Tr. 37:18-38:2. Ms. Kilgren credibly testified that detaining a noncitizen with Petitioner's degree of compliance is "not in line" with the agency's own policies. *Id.* at 61:22-23.

Ms. Kilgren credibly testified that ICE and USCIS share information and a biometric office and that noncitizens are tracked by both agencies using the same identification number for each noncitizen, called an "A-Number." Hearing Tr. 40:17-20; 53:5-11. Petitioner and Ms. Kilgren credibly testified that Petitioner received mail from USCIS at an Oregon address and that she was summoned to the Portland, Oregon USCIS office for fingerprinting. On this record, Petitioner was given every indication by ICE and DHS that she had, in fact, received permission to relocate to Oregon.

Respondents assert that ICE has no record of Petitioner receiving permission to relocate to Oregon. However, Respondents called no witnesses to testify to that fact at the evidentiary hearing and their supporting declarations contain clear inaccuracies. As Ms. Kilgren testified, a properly completed change of address will not necessarily create a form that a noncitizen could use to demonstrate their compliance. Hearing Tr. 31:9-15. The fact that USCIS, ICE's sister DHS agency, was

communicating with Petitioner at an Oregon address and summoning her to Portland using the A Number and biometric office that USCIS and ICE share is strong evidence ICE was, in fact, notified of and acquiesced to Petitioner's move to Oregon.

On this record, ICE's decision to revoke the OSUP was arbitrary and capricious.

### 3. ICE's failure to follow its own regulations in detaining Petitioner was arbitrary and capricious.

Beyond the decision to take Petitioner into detention, ICE's conduct of Petitioner's detention has failed to meet the express requirements of § 241.4(l)(1) as discussed in the previous section. ICE did not provide Petitioner with a Notice of Revocation until she had been in custody for two days, despite the regulation requiring notice "upon revocation." The July 12 Notice was, by the Government's own admission, defective in that it cited the wrong regulation and did not provide an adequate explanation of the reasons for the revocation. Petitioner credibly testified that the July 12 Notice was not provided to her in a language she understands and that she had to rely on a fellow detainee for an explanation of its contents. Nor was the July 12 Notice accompanied by an informal interview, as required by § 241.4(l)(1). As previously discussed, Petitioner did not receive notice of the reasons for the revocation of her release or the required informal interview until August 6, 2025, nearly a month after she had been taken into custody.

On this record, the Court concludes that the revocation of Petitioner's supervised release was arbitrary and capricious and that her detention is unlawful.

This provides an additional basis for the granting of the Amended Petition for Writ of Habeas Corpus.

## CONCLUSION

For the reasons set forth above, the Government's Motion to Dismiss, ECF No. 13, is DENIED. The Amended Motion for Writ of Habeas Corpus, ECF No. 16, is GRANTED and Respondents are ordered to immediately release Petitioner M.S.L. from custody, subject to the conditions of her preexisting Order of Supervised Release. The grant of the Amended Petition for Writ of Habeas Corpus renders Petitioner's Motion to Transfer Petition to the Oregon District, ECF No 8, and her Motion for Temporary Restraining Order, ECF No. 23, MOOT.

It is so ORDERED and DATED this ____21st____ day of August 2025.


 /s/Ann Aiken                                    
ANN AIKEN
United States District Judge